(74 App. Div. 499.)

## KELLY v. ROOT.

(Supreme Court, Appellate Division, First Department. July 8, 1902.)

1. REFORMATION OF INSTRUMENTS—EVIDENCE—SUFFICIENCY.

Plaintiff agreed to purchase defendant's stock in a corporation, and gave his notes therefor. Afterwards he asked to have the agreement reduced to writing, and defendant gave him a note to his attorney. Plaintiff himself called on the attorney, and gave him a memorandum of the contract, which was thereupon executed. It did not appear that defendant had made any suggestion whatever to the attorney. Plaintiff and his wife both testified that there was an agreement, not incorporated in the written contract, that he should not be obliged to pay the notes if the business did not pay, but did not testify that he communicated such condition to the attorney, and their testimony was contradicted by defendant. *Held*, that plaintiff was not entitled to a reformation of the written contract.

2. SALES — AGREEMENT — CONSTRUCTION — COLLATERAL SECURITY—RIGHTS OF SELLER.

An agreement for the sale of corporate stock recited that the purchaser had deposited the stock with the seller as security for the purchase-money notes, and provided that the seller should not "dispose of, hypothecate, or pledge said stock, or any portion thereof, in any manner whatsoever." *Held* that, on the purchaser's default in one of the notes, the seller was entitled to have a formal assignment of the stock executed to him, so as to enable him to realize on the stock.

Hatch, J., dissenting.

Appeal from special term, New York county.

Action by Daniel J. Kelly against Charles T. Root. From a judgment dismissing the complaint on the merits, and finding for the defendant on a counterclaim (75 N. Y. Supp. 163), plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

C. J. Shearn, for appellant.

William G. McKnight, for respondent.

LAUGHLIN, J. The action was brought to reform a written agreement on the ground of mutual mistake. On the 15th day of September, 1899, the plaintiff was the business manager of the American Queen, a corporation organized under the laws of West Virginia, having its principal office in the city of New York, and engaged in the publication of a monthly magazine called the "American Queen." The capital stock of the corporation consisted of 10,000 shares of preferred stock and 10,000 shares of common stock, of the par value of $10 each. The plaintiff was a large owner of this stock, and the defendant owned 4,626 shares of the common stock and 4,950 shares of the preferred stock. It was agreed that the defendant should sell his stock to the plaintiff for the sum of $5,000. In fulfillment of this agreement the plaintiff delivered to the defendant his five promissory notes, for $1,000 each, all bearing date on that day, and falling due in 12, 18, 24, 30, and 42 months, respectively. The certificates of stock held by the defendant were surrendered, and new certificates issued in the name of the plaintiff, which were delivered to the defendant as collateral security for the payment of the notes.

The understanding was that payments of $500 might be made on the notes at any time, and that upon each payment the defendant should surrender to the plaintiff 514 shares of the common stock and 550 shares of the preferred stock. Subsequently the plaintiff desired to have the agreement formally reduced to writing by an attorney. The defendant acceded to his request in this regard, and gave the plaintiff a letter to Mr. White, who was defendant's attorney. The plaintiff called on the attorney and gave the information, from which a formal agreement, dated October 18, 1899, was drafted, which was signed by the parties. It does not appear that the defendant made any suggestion to the attorney with reference to the agreement. The plaintiff testified concerning his interview with the attorney, "I asked Mr. White to draw up a contract, and gave him such memoranda as I thought was necessary to make it up." The agreement as thus prepared and signed is the one sought to be reformed. · The plaintiff contends that it was the understanding between him and the defendant that, if the magazine did not pay, he would not be obliged to pay the notes, and he desires to have the agreement reformed by incorporating a provision to that effect. The plaintiff testifies that such was the agreement, and in this he is corroborated by his wife, but he does not testify that he communicated that part of the agreement to the attorney. The testimony of the plaintiff and his wife in this regard is controverted by the defendant. This is the only testimony bearing on that issue.

Whether the plaintiff's apparently absolute liability was to become unenforceable in the event that the magazine was not a financial success thus became a question of fact, which the trial court has determined in favor of the defendant. It appears that the plaintiff paid $500 on one note and $1,000 on another, when, according to his own testimony, the magazine was not on a paying basis. In this state of the testimony, and in view of the fact that the plaintiff gave the sole information upon which the agreement was prepared, and subsequently signed it, after hurriedly reading or glancing over it, it is manifest that the court would not have been warranted in reforming the agreement.

It appears that the formal contract in writing does not embody the entire contract of the parties, according to the undisputed testimony; but the provisions omitted were for the benefit of the defendant, and were not put in issue. According to the defendant's testimony, he was not to hold the plaintiff upon the notes for any deficiency if the assets of the corporation were not sufficient to pay the same; but this was not the agreement as contended for by the plaintiff, and the plaintiff made no request to amend his complaint by demanding a reformation of the contract in accordance with the testimony of the defendant.

It appears that the plaintiff defaulted in the payment of the note maturing March 15, 1901; and the defendant, in his counterclaim, alleges that the plaintiff failed to make a complete delivery of the stock as collateral, in that no assignment of the stock, in blank or otherwise, was made to the defendant, and the defendant demanded that the plaintiff be ordered and adjudged to indorse and properly

assign the certificates remaining in the defendant's hands as collateral to the notes remaining unpaid. The formal agreement of October 18, 1899, recites that the plaintiff has deposited the stock in question with the defendant as collateral security for the payment of the notes, but it was therein expressly agreed that the defendant should not "dispose of, hypothecate, or pledge said stock, or any portion thereof, in any manner whatsoever." The plaintiff contends that in consequence of this provision the defendant is not entitled to dispose of the stock, even after default in payment of the notes. The trial court has decided otherwise, and has found that this clause was designed to operate before and not after default. In this we concur. The plaintiff having defaulted, it is manifest that it was the understanding and intention of the parties that the defendant might have recourse to the pledged stock for payment of the indebtedness. It is evident that, without a formal assignment by the plaintiff, the defendant will be unable to dispose of the stock. The decree requiring the plaintiff to execute such assignment was therefore warranted. This will enable the defendant to give good title to a purchaser of the stock, and he will be under obligations to account to the plaintiff for any surplus of the proceeds of the sale.

It follows, therefore, that the judgment should be affirmed, with costs. All concur, except HATCH, J., who dissents.

HATCH, J. (dissenting). That the written contract made and entered into between these parties did not express the whole of the agreement is established not only by satisfactory proof, but by evidence clear, cogent, and convincing. Indeed, it is undisputed. Both parties to this action insist that the verbal agreement which they made was different from that expressed in the written contract in several particulars. It is not disputed but that the defendant was entitled to have as collateral security for the performance by the plaintiff of his agreement a policy of life insurance for $5,000 upon the life of the plaintiff. After the execution of the written contract, the defendant demanded the fulfillment of the contract in this respect, and the plaintiff immediately complied therewith; it being the clear understanding that such policy was to be given, although not a syllable was mentioned concerning the same in the written agreement. Probably neither party at that time had noticed this omission or any other. It is also clearly established by the proof that there was an agreement orally entered into by which the property of the corporation was to be responsible for the payment of the notes, and their payment was conditioned upon the prosperity of the corporation as a going business. If that did not pay, then it seems to be clearly established that the notes were not to be discharged by the plaintiff as a personal obligation, but depended upon the paying capacity of the corporation. Otherwise the language of the defendant in his letter of February 18, 1901, is utterly senseless. Therein he states:

"The condition of the Queen has no longer any bearing upon the payment of these notes, as you distinctly declined to allow her to be used to pay them in accordance with our verbal arrangement at the time they were given. It is up to you now, and the Queen does not count."

77 N.Y.S.—28

If this does not state that the verbal arrangement which was made between the parties was to pay the notes with either the earnings or the property of the Queen, then it must be said that language does not express what it means. This statement clearly and cogently shows that the difference between these parties as to what was the terms of the verbal contract is very slight. Both agree that the property and earnings of the Queen were to be used for the purpose of discharging the indebtedness, and that it was from that source, and that alone, that it was expected the payment would be made. Upon this point the plaintiff and his witness testified that the agreement was that, if the Queen did not pay, the notes were not to be paid, and the defendant was then to be remitted to the property of the Queen for the payment of such interest as was represented by his holdings of the stock, but that it was not understood or intended that the personal obligations given by the plaintiff should be paid by him, independent of the property and earnings of the corporation. This is further confirmed by the fact that the stock which was transferred by the defendant as collateral security was not to be disposed of by him to any other person, and it was for that reason that the stock was not indorsed by the plaintiff at the time of its delivery. These facts, when taken in connection with the testimony offered by the plaintiff, seem clearly to establish that the agreement was that the plaintiff should take the sole management and control of the business, conduct the same, pay the notes if the property earned sufficient for that purpose, and, if it did not so earn, then the defendant was remitted to enforce or receive to the extent of his interest in the property from its proceeds, without resort to the personal obligation of the plaintiff. Doubtless the parties contemplated that the corporation would earn sufficient to pay the notes, but the contingency was also contemplated that it might not so earn, and therefore provision was made for relief from the obligations of the notes by the plaintiff in that event. There is little, if any, dispute in the testimony showing or tending to show that the parties when they made the written agreement did not intend to embrace therein the whole of the oral agreement which had been made. On the contrary, it seems clear that after the verbal agreement it was thought best by both parties to put it into writing. Nothing appears from which it can be fairly said that the parties intended to embrace only a part in the writing. There was no sense in having a written agreement unless it was intended to embody the whole of the verbal agreement which had been made. The failure to so embody it in the written contract was evidently the omission to lay before the attorney who drew it the entire terms of the verbal understanding. The attorney was not present when the negotiations between the parties were had. Consequently he was in ignorance of what the whole arrangement was and only received information respecting the terms so far as they were laid before him. The omission was undoubtedly due to the failure to clearly express to the attorney the whole of the terms of the engagement, but from this ought not to be inferred the intent to omit therefrom part of the verbal agreement. On the contrary, it is fair to infer that it was the fault of memory, and not of intention, which is the usual reason found

present where a written agreement does not embody the whole of the verbal contract. The conduct of both parties with respect to the written contract was in good faith. They intended to embody the whole of the agreement, and failed to accomplish the purpose through omitting fully to explain it to the attorney who drew it. But immediately thereafter the defendant insisted upon the performance of what had been omitted therefrom which affected him, and the plaintiff did the same thing when a question arose, affecting his rights under the arrangement. The mistake, therefore, is clearly and satisfactorily established, and a basis was made for a reformation of the contract. Southard v. Curley, 134 N. Y. 148, 31 N. E. 330, 16 L. R. A. 561, 30 Am. St. Rep. 642; Pitcher v. Hennessey, 48 N. Y. 415. Not only has the court denied this relief, but, as I view the case, it has gone far beyond the plain provisions of the contract in awarding an affirmative judgment against the plaintiff. By the third clause of the written contract it is provided "that the party of the first part shall not dispose of, hypothecate, or pledge said stock, or any portion thereof, in any manner whatsoever." It is evident not only from this clause of the contract, but from the evidence in the case, that the plaintiff was insistent that the stock should not go out of the hands of the defendant. They had been long together, were on friendly terms, and the plaintiff was desirous that no third person should become interested in the property, and he took means to secure this result. The judgment violates this provision of the contract, and awards judgment to the defendant, requiring the certificate to be indorsed so that the defendant may dispose of the same, although he has no judgment enforcing the note, and is therefore in no position to sell or dispose of the stock. By virtue of the terms of the judgment, however, which he has recovered, he may dispose of the stock without enforcing the notes, and thus defeat the purpose of the written agreement.

For these reasons, I think that the judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event.